UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

TIMOTHY BATT,
LUANN BATT, and
JOSEPH BATT,

|                           |                    |
|---------------------------|--------------------|
|              Plaintiffs,  | REPORT             |
|       v.                  | and                |
|                           | RECOMMENDATION     |
| JOSEPH BUCCILLI,          | 12-CV-01198G(F)    |
|              Defendant.    |                    |

_____

APPEARANCES:       NIXON PEABODY LLP
                   Attorneys for Plaintiffs
                   KEVIN T. SAUNDERS, of Counsel
                   1300 Clinton Square
                   Rochester, New York  14604

                   HOME SCHOOL LEGAL DEFENSE ASSOCIATION
                   Attorneys for Plaintiffs
                   PETER K. KAMAKAWIWOOLE, JR.,
                   DARREN A. JONES, and
                   JAMES R. MASON, III, of Counsel
                   1 Patrick Henry Circle
                   P.O. Box 3000
                   Purcellville, VA 20132

                   BOUVIER PARTNERSHIP, LLP
                   Attorneys for Defendant
                   PAULA EADE NEWCOMB, of Counsel
                   350 Main Street
                   Suite 1800
                   Buffalo, New York  14202-3714

## JURISDICTION

This case was referred to the undersigned on February 5, 2013, by Honorable Richard J. Arcara.[1]  The matter is presently before the court on motions for summary judgment filed by Defendant on December 15, 2014 (Dkt. 32), and by Plaintiff on January 30, 2015 (Dkt. 35).

## BACKGROUND

On December 4, 2012, Plaintiffs Timothy Batt ("Mr. Batt"), LuAnn Batt ("Mrs. Batt"), and Joseph Batt ("Joe Batt") (together, "Plaintiffs" or "the Batts"), commenced this action pursuant to 42 U.S.C. § 1983, alleging Defendant Orchard Park Department of Police Lieutenant Joseph Buccilli ("Defendant" or "Buccilli"), violated their Fourth Amendment rights against unreasonable searches on April 17, 2012, when Buccilli entered the Batts' home without permission and in the absence of exigent circumstances, to conduct a welfare check on Mrs. Batts' father, Fred Puntoriero ("Puntoriero").  Defendant's answer (Dkt. 5), was filed February 4, 2013.

On December 15, 2014, Defendant filed a motion for summary judgment (Dkt. 32) ("Defendant's Motion"), attaching the Affidavit of Paula M. Eade Newcomb, Esq., in Support of Summary Judgment Motion (Dkt. 32-1) ("Newcomb Affidavit"), Defendant's Memorandum of Law in Support of Motion for Summary Judgment (Dkt. 32-15) ("Defendant's Memorandum"), a Rule 56 Statement of Uncontested Facts (Dkt. 32-16) ("Defendant's Statement of Facts"), and exhibits A through N (Dkts. 32-2 through 32-14, and Dkt. 33 (manually filed video and audio tapes)).  On January 30, 2015, Plaintiffs filed a cross-motion for summary judgment (Dkt. 35) ("Plaintiffs' Motion"), attaching

---

[1] This matter has since been reassigned to Honorable Lawrence J. Vilardo, March 7, 2016 Text Order (Dkt. 43), and further reassigned to Chief District Judge Frank P. Geraci, Jr.  April 8, 2016 Text Order (Dkt. 44).

Plaintiffs' Memorandum in Opposition to Defendant's Summary Judgment Motion and in

Support of Plaintiffs' Cross-Motion (Dkt. 35-1) ("Plaintiffs' Memorandum"), Plaintiffs'

Rule 56(a)(1) Statement of Uncontested Facts in Support of Plaintiffs' Cross-Motion for

Summary Judgment (Dkt. 35-2) ("Plaintiff's Statement of Facts"), the Affidavit of

Counsel James R. Mason, III, in Support of Plaintiffs' Cross-Motion for Summary

Judgment (Dkt. 35-19) ("Mason Affidavit"), and an appendix of exhibits filed in 16 parts

(Dkts. 35-3 through 35-18) ("Plaintiffs' Exh(s). __, Appendix Pt. __ at __").  Also filed on

January 30, 2015, was Plaintiffs' Memorandum in Opposition to Defendant's Summary

Judgment Motion and in Support of Plaintiffs' Cross-Motion (Dkt. 36) ("Plaintiffs'

Response"),[2] attaching Plaintiffs' Rule 56(a)(2) Opposing Statement of Uncontested

Facts and Statement of Additional Material Facts (Dkt. 36-1) ("Plaintiff's Opposing

Statement of Facts").

On March 2, 2015, Defendant filed the Affidavit of Paula M. Eade Newcomb,

Esq., in Opposition to Plaintiffs' Motion for Summary Judgment and in Further Support

of Defendant's Motion for Summary Judgment (Doc. No. 38) ("Newcomb Response

Affidavit"), Defendant's Memorandum of Law in Further Support of Defendant's Motion

for Summary Judgment and in Opposition to Plaintiffs' Cross-Motion for Summary

Judgment (Dkt. 39) ("Defendant's Response"), Defendant's Reply to Plaintiffs'

Statement of Uncontested Facts (Dkt. 40) ("Defendant's Opposing Statement of Facts"),

and Defendant's Reply to Plaintiffs' Statement of Contested and Uncontested Facts in

Opposition Set Forth in Opposition to Defendant's Motion for Summary Judgment (Dkt.

41) ("Defendant's Reply Statement of Facts").  On March 16, 2015, Plaintiffs filed

---

[2] The court notes that the same document has been filed as Plaintiffs' Memorandum (Dkt. 35-1) and as Plaintiffs' Response (Dkt. 36).

Plaintiffs' Reply Memorandum of Law (Dkt. 42) ("Plaintiffs' Reply"), attaching the

Affidavit of Counsel James R. Mason, III, in Support of Plaintiffs' Cross-Motion for

Summary Judgment (Dkt. 42-1) ("Mason Reply Affidavit"), and the Affidavit of Peter K.

Kamakawiwoole, Jr., Esq. (Dkt. 42-2) ("Kamakawiwoole Affidavit").  Oral argument was

deemed unnecessary.

Based on the following, Defendant's Motion should be GRANTED; Plaintiffs'

Motion should be DENIED.  The Clerk of the Court should be directed to close the file.


## **FACTS**[3]

This action arises out of a police welfare check ("the welfare check"),[4] performed

by Defendant Joseph Buccilli ("Buccilli"), a Lieutenant with the Orchard Park Police

Department in Orchard Park, New York ("Orchard Park"), at a home located at 3122

Bieler Road, in Orchard Park ("Batts' home"), on April 17, 2012.  Residing at the Batts'

home at the time of the welfare check were Plaintiffs Timothy Batt ("Mr. Batt"), LuAnn

Batt ("Mrs. Batt"), and Joseph Batt ("Joe Batt") (together, "Plaintiffs"), additional children

Gianna Batt ("Gianna Batt"), Veronica Batt ("Veronica Batt"), and Anthony Batt

("Anthony Batt"), and the 82-year old father of Mrs. Batts, Fred Puntoriero ("Puntoriero"),

who moved into the Batts' home in December 2011.  Puntoriero had previously lived in

his own home in Depew, New York ("the Depew home").

---

[3] Taken from the pleadings and motion papers filed in this action.
[4] A "welfare check" occurs when a police officer is directed to check on the well-being of a person –
usually a senior citizen – whom the police have a reason to believe, based on a report received from a
third party – often a relative or friend – is injured or in danger.   *See* What is a police welfare check?,
available at https://www.reference.com/government-politics/police-welfare-check-351b1aea09018746#,
last visited July 12, 2016.

In 2009, Puntoriero, then living on his own in his Depew home, was taken to

Millard Fillmore Suburban Hospital in Amherst, New York, a local hospital ("the

hospital"), where he was diagnosed with "failure to thrive" based on Puntoriero's inability

to adequately eat and drink to maintain his health.  Mrs. Batt Dep. Tr[5]. at 31-32.

Because the hospital refused to discharge Puntoriero to return to live alone in his

Depew home, requiring Puntoriero either enter assisted living or live with a family

member, Puntoriero initially moved into the Batts' home.  In January 2010, however, the

decision was made that because the Batts still had a number of children living in the

home, whereas Puntoriero's son Joseph ("Joseph Puntoriero"), and Joseph Puntoriero's

wife (and Puntoriero's daughter-in-law), Annette ("Annette Puntoriero"), did not then

have any children living in their home, Puntoriero would return to his Depew home into

which Joseph and Annette Puntoriero would also move to provide care to Puntoriero.

Although Puntoriero's health was good for the rest of 2010, with the exception of

some mild dementia, in 2011, Puntoriero's health began to fail with Puntoriero becoming

depressed, requiring the use of a walker, and having a poor appetite.  On February 28,

2011, while Joseph and Annette Puntoriero were living with Puntoriero in the Depew

home, Puntoriero signed a deed transferring ownership of the Depew home to Joseph

Puntoriero and reserving to Puntoriero a life estate.  Mrs. Batt, who was Puntoriero's

power of attorney, was unaware of the transaction.  Puntoriero was hospitalized in

March and July 2011.  In August 2011, Puntoriero passed out while in the Depew home

and was sent by Annette Puntoeriero, unaccompanied, to the emergency room at the

hospital.  It was then decided that Puntoriero would move back into the Batts' home

---

[5] References to "Mrs. Batt Dep. Tr." are to the page of the transcript of Mrs. Batt's deposition, filed as
Defendant's Exh. F (Dkt. 32-7).

because caring for Puntoriero had proven to be too much for Joseph and Annette Puntoriero. Puntoriero moved into the Batts' home in December 2011. While living in the Batts' home, Puntoriero, who had dementia and was wheelchair bound, was primarily cared for by Mrs. Batt, who is a registered nurse, but also received Hospice care from a nurse's aide several times a week.

On April 17, 2012, Annette Puntoriero placed a telephone call to the Erie County Department of Social Services ("DSS"), Adult Protective Services ("APS"), advising that on April 16, 2012, family members had been denied access to Puntoriero who, the last time he was seen, appeared very lethargic and dehydrated.[6] APS Senior Case Worker Donna Locicero ("Locicero"), contacted the Orchard Park Police Department via the 911 emergency call number, reported APS had received a call from a daughter-in-law who was concerned about the welfare of her father-in-law who lived with his daughter and son-in-law. According to Locicero, the previous day Puntoriero's son, Joseph, had been denied access to Puntoriero, and the son had not seen his father since April 2nd or 3rd, at which time Puntoriero appeared lethargic and dehydrated. Locicero, identified Annette Puntoriero as the person who made the complaint, provided Annette Puntoriero's telephone number, and requested the Orchard Park Police Department conduct a welfare check on Puntoriero at the Batts' home for which Locicero provided the address along with one of the homeowners' names, specifically, LuAnn Batt. Orchard Park Police Lt. Buccilli and Officer Kadi ("Kadi")[7] (together, "the police officers"), traveling in separate police patrol vehicles, were dispatched to the Batts' home to conduct the welfare check on Puntoriero as requested by APS based on the

---

[6] Annette Puntoriero's report included no explanation of the circumstances of the denial, later described by Mrs. Batt as pertaining to a property dispute with Joseph Puntoriero. *See* Discussion, *infra*, at18.
[7] Kadi is not a Defendant to this action.

concerns of a family member for Puntoriero's health and the fact that a family member

had recently been denied access to Puntoriero.  Officer Kadi arrived first at 4:30 P.M. on

April 17, 2012, and parked in the driveway to the Batts' home, and Buccilli, who arrived

about 30 seconds later, also parked in the driveway behind Kadi.  Buccilli and Kadi had

been advised by Orchard Park Police dispatch only that a call had been received from

APS which had received a call from a family member who was "gravely concerned"

about having been denied access to an elderly male family member for "almost two

weeks."  Buccilli Deposition Tr.[8] at 36.

Also on April 17, 2012, Punterioro was in the Batts' home while Mr. Batt was at

work and Mrs. Batt was running errands.  A health care worker had been at the Batts'

home earlier in the day to check on Mr. Puntoriero's condition, but had departed by the

late afternoon when Joe Batt, then 23 years old, was responsible for Puntoriero's care

when Defendant arrived.  Also present in the Batts' home at that time were Joe Batt's

younger siblings Gianna, Veronica, and Anthony Batt, all teenagers with Anthony the

youngest.

Upon arriving at the Batts' home, Buccilli and Kadi were met in the driveway by

Joe Batt who had no idea why the police were there and identified himself only as "Joe"

who lived in the house.  Joe Batt Dep. Tr.[9] at 36-37, 44-45, 55.  In response to Buccilli

and Kadi's explanation that they were there to conduct a welfare check on Puntoriero in

response to a request by APS based on a confidential call, Joe Batt maintains he

advised that a nurse's aide had just left, thereby confirming that Puntoriero lived there.

---

[8] References to "Buccilli Dep. Tr." are to the page of the transcript of Buccilli's deposition, filed as Defendant's Exh. C, Dkt. 32-4.
[9] References to "Joe Batt Dep. Tr." are to the page of the transcript of Joe Batt's deposition, filed as Defendant's Exh. E, Dkt. 32-6.

*Id.* at 45-46.  When Buccillo and Kadi replied that they still needed to check on

Puntoriero's welfare, Joe Batt stated he first needed to make a telephone call and asked

the officers to remain outside.  *Id.* at 48-49, 55.  Buccilli asked Joe Batt to bring

Puntoriero outside or to a window but Joe Batt continued to refuse to allow Buccilli and

Kadi to see his grandfather, Puntoriero.  Buccilli Dep. Tr. at 42.  Buccilli also asked Joe

Batt to provide a telephone number for a parent or homeowner for the residence, but

Joe Batt did not cooperate with the request and instead walked back toward the home.

Joe Batt entered the home through a side door and attempted to slam the door on the

officers who were closely following, but was prevented by Buccilli who stuck his foot in

the door.  Buccilli and Kadi then entered through the side door of the Batts' home into

the kitchen and explained they were there to conduct a welfare check on Puntoriero and

did not intend to search the home.  According to Buccilli, the police officers' entry into

the Batts' home was pursuant to the Orchard Park Department of Police standard policy

that police officers responding to a welfare check dispatch would proceed to the

designated home so long as some allegation of reasonable concern had been made.

Buccilli Dep. Tr. at 38-39.  Once the officers were inside the kitchen, Joe Batt began

recording the incident with his cell phone's video camera.  While the video camera was

running, Joe Batt argued with the police officers as to whether they were lawfully

present inside the Batts' home, asserting no exigent circumstances justified their

presence, Joe Batt Dep. Tr. at 60-61, to which Buccilli informed he was there with

respect to a call placed to APS.  *Id.* at 63.  Joe Batt maintains he did not think it was

reasonable for the police officers to conduct a warrantless welfare check on Puntoriero

based solely on a complaint received by APS.  *Id.* at 73.

While the police officers were in the Batts' home's kitchen arguing with Joe Batt, Anthony Batt placed a telephone call to another brother, Dan Batt ("Dan Batt"), who is employed as a Secret Service Agent stationed in Buffalo, New York.  Joe Batt Dep. Tr. at 64-67.  Buccilli spoke with Dan Batt, advising no warrant was necessary to perform a welfare check.  *Id.* at 66-67.  Eventually, Anthony Batt showed Buccilli into the living room where Puntoriero was seated in an armchair.  Joe Batt then did not obstruct the officers from conducting the welfare check on Puntoerio, but he did repeat that the officers did not have permission to do so.  *Id.* at 68-69.

Buccilli chatted with Puntoriero for several minutes, advising he was there in connection with an APS complaint made by a family member concerned about Puntoriero's welfare.  Buccilli observed that despite appearing frail, Puntoriero was well dressed and groomed, with a bowl of soup next to him, and that the residence appeared orderly with nothing causing Buccilli to believe any immediate action was needed other than to refer the matter back to APS for follow-up.  Buccilli Dep. Tr.aat 50-51.  Joe Batt used his cell phone to videotape Buccilli's conversation with Puntoriero.  Prior to exiting the premises, Buccilli wrote down and provided Joe Batt with the complaint number for the welfare check, and then advised Orchard Park Police dispatch of the welfare check result, including that Puntoriero appeared to be in a good environment with no dire need for further action.  *Id.* at 52-53.  Buccilli also requested dispatch have APS send a caseworker to the residence to determine if any further investigation was required.  *Id.* at 53.

Buccilli and Kadi remained outside the residence for about half an hour awaiting the arrival of the APS case worker, Nancy Sullivan ("Sullivan").  While they waited, Joe

Batt telephoned his mother and informed her of the presence of police officers at the home.  Buccilli and Kadi moved their respective patrol vehicles from the driveway of the Batts' house to the street in compliance with Joe Batts' request that the police officers leave the premises.  Buccilli Dep. Tr. at 54.  Orchard Park Chief of Police Benz ("Chief Benz") then arrived at the Batts' home and was advised by Buccilli of the situation including Joe Batt's "belligerent" or "hostile" attitude toward the police officers, and that Joe Batt had continued to refuse to produce any identification.  Joe Batt stated to the police officers he intended to file a personnel complaint against Buccilli and Kadi.  *Id.* at 60.

The police officers and Chief Benz remained in the street waiting for the caseworker when first Mr. Batt and then Mrs. Batt arrived home.  Buccilli Dep. Tr. at 58-59.  Mr. Batt apologized for Joe Batt's behavior and Mrs. Batt escorted Sullivan, the APS caseworker who had also arrived, into the home.  *Id.* at 59.  Mrs. Batt and Sullivan were inside the home about five minutes, after which Sullivan reported to Chief Benz that there were no further issues regarding the welfare check of Puntoriero.  *Id.* at 60-61.

It is undisputed that aside from briefly speaking with Puntoriero, Buccilli did not conduct any search of the premises or of any person within the house, Joe Batt Dep. Tr. at 72-73, and that Buccilli advised Joe Batt the reason for his presence – to conduct a welfare check on Puntoriero pursuant to a confidential telephone call – prior to entering the Batts' home on April 17, 2012.  No criminal charges were filed in connection with the welfare check.

## DISCUSSION

**1.     Summary Judgment**

Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) and (b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003).  The court is required to construe the evidence in the light most favorable to the non-moving party.  *Collazo v. Pagano*, 656 F.3d 131, 134 (2d Cir. 2011).  The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment.  *Celotex*, 477 U.S. at 322; *see Anderson*, 477 U.S. at 247-48 ("summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").  "A fact is material if it 'might affect the outcome of the suit under governing law.'"  *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).

"[T]he evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions."  *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988)).  A defendant is entitled to summary judgment where "'the plaintiff has failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on'" an essential element of a

claim on which the plaintiff bears the burden of proof.  *In re Omnicom Group, Inc., Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010) (quoting *Burke v. Jacoby*, 981 F.2d 1372, 1379 (2d Cir. 1992)).  Once a party moving for summary judgment has made a properly supported showing of the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor.  *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995).  "[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial."  *Hayes v. New York City Dept. of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996).

Plaintiffs' claims seek damages for alleged violations of their constitutional rights pursuant to 42 U.S.C. § 1983 ("§ 1983"), which imposes civil liability upon persons who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured by the Constitution and laws of the United States.  Section 1983, however, does not itself provide a source of substantive rights, but instead provides the mechanism by which a plaintiff may seek vindication of federal rights conferred elsewhere.  *Graham v. Connor*, 490 U.S. 386, 393-94 (1989).  Here, Plaintiffs' claim violations of their Fourth Amendment rights, as made applicable to the states by the Fourteenth Amendment.

## 2.    Official Capacity Claims

Defendant argues that without alleging and proving an official custom or policy was the cause of the alleged constitutional violations, Plaintiffs' claims must be

dismissed as against Defendant in his official capacity.  Defendant's Memorandum at 12.  Plaintiff has not responded in opposition to this argument.

It is settled that the naming of a government official in his official capacity is equivalent to suing the government entity for which no § 1983 claim lies absent establishing the challenged conduct was undertaken pursuant to the municipality's official custom or policy.  *Patterson v. County of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004) ("[W]hen the defendant sued for discrimination under . . . § 1983 is a municipality – or an individual sued in his official capacity – the plaintiff is required to show that the challenged acts were performed pursuant to a municipal policy or custom." (internal citations omitted)).  In the instant case, not only have Plaintiffs failed to allege that Buccilli's actions were pursuant to any official custom or policy of the Orchard Park Police Department, but Buccilli is named in the Complaint as sued only in his personal capacity.  Accordingly, summary judgment should be GRANTED in favor of Defendant insofar as Plaintiffs assert any claims against Buccilli in his official capacity.

**3.      Punitive Damages**

Defendant moves to dismiss all claims for punitive damages, arguing punitive damages cannot be awarded against a police officer in his official capacity, and that insofar as Buccilli is sued in his individual capacity, punitive damages may be awarded only if the unlawful conduct was motivated by evil intent or involved reckless or callous indifference to the federally protected rights of others.  Defendant's Memorandum at 13.  Plaintiffs have not argued in opposition to Defendant's request to dismiss all claims for punitive damages.

Insofar as the complete absence of any assertion that Defendant's alleged violation of Plaintiff's constitutional rights was pursuant to any municipal policy or custom is fatal to any claim against Defendant in his official capacity, punitive damages also cannot be awarded against Defendant in his official capacity.  *See Ivani Contracting Corp. v. City of New York*, 103 F.3d 257, 262 (2d Cir. 1997) (insofar as municipal officers are sued in their official capacity, they enjoy the same immunity from punitive damages as the municipality).  Further, as in the instant case, absent evidence of an "evil motive or intent" or "callous indifference" to Plaintiff's constitutional rights, punitive damages are not recoverable against municipal officials in their individual capacities.  *Id.* (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)).  Summary judgment should thus be GRANTED in favor of Defendant insofar as Plaintiffs seek punitive damages against Defendant either in his official or individual capacity.

**4.     Fourth Amendment**

Defendant argues in support of summary judgment that his warrantless entry into the Batts' home to conduct the welfare check of Puntoriero was justified by the exigent circumstances exception to the Fourth Amendment warrant requirement.  Defendant's Memorandum at 4-9.  Plaintiffs argue in opposition to summary judgment as to Defendant and in support of summary judgment in favor of Plaintiffs that the circumstances on April 17, 2012 do not support a finding that it was objectively reasonable for Defendant to enter the Batts' home to conduct a welfare check on Puntoriero,  Plaintiffs' Memorandum at 9-21, and that there is sufficient information in the record upon which a reasonable jury could find that Defendant knew the report received by APS was insufficient to support a determination that Puntoriero's condition

14

was an "urgent concern." *Id.* at 21-24. In further support of summary judgment, Defendant reiterates that no warrant was required based on the exigent circumstances confronting Defendant, Defendant's Reply at 4-10, while Plaintiffs maintain that "welfare checks" do not arise to "exigent circumstances" and, as such, should not be "freed" from their "constitutional moorings." Plaintiffs' Reply at 3-10. Summary judgment should be granted in favor of Defendant because his entry into the Batts' home to check on Puntoriero's welfare was not in violation of the Fourth Amendment.

"'It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.'" *Kentucky v. King*, 563 U.S. 452, 459 (2011) (quoting *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (further citation and quotation marks omitted)). Nevertheless, the Supreme Court has "recognized that this presumption may be overcome in some circumstances because '[t]he ultimate touchstone of the Fourth Amendment is 'reasonableness.''" *Id.* (quoting *Brigham City*, *supra*, at 403). "Accordingly, the warrant requirement is subject to certain reasonable exceptions." *Id.* at 403. Among the exceptions identified by the Court as justifying the warrantless entry into a home are exigent circumstances including the need to enter a home "to render emergency assistance to an injured occupant or to protect an occupant from imminent injury," *id.* (citing *Brigham*, *supra*, at 403), provided the exigent circumstances were not manufactured by the responding law enforcement officers. *Id.* (citing *United States v. Gould*, 364 F.3d 578, 590 (5th Cir. 2004)). "This 'emergency aid exception' does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises.'" *Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (citing *Brigham City*, *supra*, at 404-

05).  Rather, the emergency aid exception "requires only an objectively reasonable
basis for believing that a person within the house is in need of immediate aid."  *Id.*
(internal quotation marks, brackets, and citations omitted).  Nor does a responding
police officer "need ironclad proof of a likely serious, life-threatening injury to invoke the
emergency aid exception."  *Fisher*, 558 U.S. at 49.  As such, a reviewing court should
not "replace th[e] objective inquiry into appearances with its hindsight determination that
there was in fact no emergency."  *Id.*  In short, "the ultimate decision of whether a
search was objectively reasonable in light of exigent circumstances is a question of
law."  *United States v. Andino*, 768 F.3d 94, 98 (2d Cir. 2014).

In the instant case, the court limits its consideration of the facts to those
circumstances confronting Defendant upon responding to the police dispatch directing
him to the Batts' home in response to an APS call for a welfare check on an elderly man
whose relative had been denied access to the day before and who had been known to
suffer from lethargy and dehydration.  Upon arriving at the Batts' home, Joe Batt
essentially refused to speak with Buccilli and Kadi other than to tell the police officers to
leave the property.  Joe Batt Dep. Tr. at 42-45.  Joe Batt also refused to cooperate with
Buccilli's alternative request that, rather than allowing the police officers into the home,
Joe Batt could bring Mr. Puntoriero to the door where the officers could speak with him,
or to a window to permit the officers to visually ascertain whether Mr. Puntoriero
appeared to be in any distress or in need of assistance.  Buccilli Dep. Tr. at 42.  A
reasonable police officer would also interpret Joe Batt's demeanor in storming back
inside the house and attempting to slam the door on the police officer as a possible
attempt to conceal a problematic situation, especially given that Buccilli and Kadi were

16

responding to a report from APS that was based on a confidential, but not anonymous, call from a concerned family member who reported that the previous day, another family member had been denied access to Mr. Puntoriero who was elderly and who had previously been diagnosed with failure to thrive.  *See Howard v. Town of DeWitt*, 2015 WL 2382334, at ** 3-4 (N.D.N.Y. May 19, 2015) (holding police officer's warrantless entry into home to conduct welfare check of minor child did not violate Fourth Amendment where welfare check was dispatched in response to father's report that the child's mother failed to bring child for scheduled visitation and, upon police officer's arrival at mother's residence, mother refused to answer the door, refused officer's request that the minor child be brought to the door of residence where the officer could observe her, and mother's only response was that "no one's hurt, no one's bleeding").

Insofar as Mrs. Batt testified at her deposition, Mrs. Batt's Dep. Tr. at 10-13, that because she home-schooled her children, she had repeatedly advised her children that they were vulnerable to anonymous accusations of educational neglect and instructed her children not to allow any social worker or police officer into the house, neither Buccilli nor Kadi would have been aware of such circumstances, nor does Joe Batt maintain that he informed Buccilli or Kadi that he was denying them access to the home because of his mother's instructions.  Notably, nothing in the record establishes that Buccilli or Kadi were even aware that the Batts home-schooled their children, and Joe Batt denies ever being instructed by his parents not to allow the police into the house. Joe Batt Dep. Tr. at 36.  Accordingly, Mrs. Batt's assertion regarding her belief that her home may be targeted by law enforcement officials to harass her for homeschooling is not a consideration with regard to Buccilli's qualified immunity defense.  Nor is there

17

anything in the record indicating either Buccilli or Kadi had any knowledge of any property dispute, *i.e.*, the transfer of the Depew home to Joseph Puntoriero, between the Batts and other family members, or that on the previous day, Mrs. Batt had not necessarily denied her brother access to the father, but, as Mrs. Batt maintains, Mrs. Batt Dep. Tr. at 23-29, requested her brother step outside the Batts' home to discuss outside of Puntoriero's hearing her request that Joe Puntoriero bring some of the father's furniture to the Batts' home, hoping the presence of some items of sentimentality would help with Puntoriero's dementia, and that once outside, Joe Puntoriero became angry and left without having seen or visited with his father.

Furthermore, the video of Buccilli and Kadi inside the kitchen of the Batts' home, and of Buccilli questioning Puntoriero, captured by Joe Batt using the video camera on his cell phone, Defendant's Exh. M, is consistent with Buccilli's report of the encounter, with Buccilli calmly explaining to Joe Batt that the police were present solely to conduct a welfare check of Puntoriero pursuant to a call placed by a confidential source to APS, and Buccilli briefly speaking with Puntoriero, asking questions pertaining to Puntoriero's well-being and whether Puntoriero was in need of anything. The audio of the confidential call made by Annette Puntoriero to APS, Defendant's Exh. N, is consistent with the information provided by the Orchard Park Police Department dispatch, with the exception that the name of the caller is not provided by dispatch to the police.

Accordingly, the undisputed evidence in the record establishes that under the circumstances, Defendant's warrantless entry into the Batts' home to conduct the welfare check of Mr. Puntoriero was not unreasonable and, as such, did not violate Plaintiffs' Fourth Amendment right to be free from unreasonable searches. Summary

judgment should thus be GRANTED in favor of Defendant on the Fourth Amendment claim.

## 5.    Qualified Immunity

Alternatively, Defendant is entitled to qualified immunity on the Fourth Amendment claim.  "Qualified immunity shields law enforcement officials from § 1983 claims for money damages provided that their conduct does not violate clearly established constitutional rights of which a reasonable person would have been aware." *Zalaski v. City of Hartford*, 723 F.3d 382, 388 (2d Cir. 2013) (citing *Ashcroft v. al-Kidd*, __ U.S. __, 131 S.Ct. 2074, 2080 (2011), and *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982)).  A qualified immunity analysis asks two questions including whether "the facts show that the office's conduct violated plaintiff's constitutional rights," and, if so, whether "the right was clearly established at the time of defendant's actions."  *Id.* (citing *al-Kidd*, 131 S.Ct. at 2080, and *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007)).  Courts are no longer required to sequentially answer these two questions; rather, it is particularly appropriate to address the second question first where the first question "turns on difficult or novel questions of constitutional or statutory interpretation, but it is nevertheless clear that the challenged conduct 'was not objectively unreasonable in light of existing law.'"  *Id.* at 389 (quoting *Coolick v. Hughes*, 699 F.3d 211, 219-20 (2d Cir. 2012), and citing *al-Kidd*, 131 S.Ct. at 2080).

"To determine whether a right was clearly established, we consider 'whether the right in question was defined with reasonable specificity,' 'whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question,' and 'whether under preexisting law a reasonable defendant officer would

have understood that his or her acts were unlawful.'" *Barnes v. Furman*, 629 Fed.Appx.

52, 55-56 (2d Cir. Oct. 22, 2015) (quoting *Dean v. Blumenthal*, 577 F.3d 60, 68 (2d Cir.

2009)).   Even if the right at issue were clearly established, if it was objectively

reasonable for the defendant to believe that his act did not violate the plaintiff's

constitutional rights, the defendant may nevertheless be entitled to qualified immunity.

*Saucier v. Katz*, 533 U.S. 194, 201-02 (2001); *Lowth v. Town of Cheektowaga*, 82 F.3d

563, 568-69 (2d Cir. 1996).   This "objective reasonableness" part of the test is met if

"officers of reasonable competence could disagree on the [legality of the defendant's

actions]."   *Malley v. Briggs*, 475 U.S. 335 (1986).   "The availability of the defense

depends on whether a reasonable officer could have believed his action to be lawful, in

light of clearly established law and the information he possessed."   *Weyant v. Okst*, 101

F.3d 845, 858 (2d Dir. 1991) (internal quotation marks and citation omitted).   Also to be

considered in determining whether a police officer is qualifiedly immune from personal

liability under the Fourth Amendment is "whether [the officer] is entitled to a qualified

good faith immunity based on his following the policy and training of the police

department . . . ."   *Dodd v. City of Norwich*, 827 F.2d 1, 4 (2d Cir. 1987).   Where,

however, the objective reasonableness of an officer's actions depends on disputed

facts, summary judgment based on qualified immunity is properly denied.   *Rivera v.

United States*, 928 F.2d 592, 607 (2d Cir. 1991).

Accordingly, "qualified immunity provides a broad shield.   It does so to ensure

'that those who serve the government do so with the decisiveness and the judgment

required by the public good.'"   *Zalaski*, 723 F.3d at 389 (quoting *Filarsky v. Delia*, __

U.S. __, 132 S.Ct. 1657, 1665 (2012)).   "Toward that end, it affords officials 'breathing

room to make reasonable but mistaken judgments' without fear of potentially disabling liability." *Id.* (quoting *Messerschmidt v. Millender*, __ U.S. __, 132 S.Ct. 1235, 1244 (2012)).  "In sum, qualified immunity employs a deliberately 'forgiving' standard of review," providing "'ample protection to all but the plainly incompetent or those who knowingly violate the law.'"  *Id.* (quoting *Amore v. Novarro*, 624 F.3d 522, 530 (2d Cir. 2010), and *Malley*, 475 U.S. at 341).  In the instant case, regardless of whether Buccilli lawfully entered the Batts' home on April 17, 2012, it is clear from the undisputed facts that a reasonable police officer confronted with similar circumstances would not have believed his entry, without a warrant, into the Batts' home to check on the welfare of Puntoriero was in violation of the Fourth Amendment.

In particular, as Buccilli explains, Buccilli Dep. Tr. at 38-39, Buccilli's entry into the Batts' home was pursuant to standard policy, to wit, whenever the Orchard Park Police Department dispatched a welfare check, the responding officer would proceed to the designated home provided some allegation of reasonable concern had been made. *See Dodd*, 827 F.2d at 4 (2d Cir. 1987) (whether defendant police officer in § 1983 action was following police department's policy and training is relevant consideration on qualified immunity defense).  Further, absent any Supreme Court or Second Circuit precedent clearly establishing a right to traditional Fourth Amendment protections during the type of police entry at issue here, particularly, the warrantless entry into a residence to check on the welfare of an elderly person pursuant to complaint received by APS from a confidential, but not anonymous, call made by a close family member, a reasonable police officer would not have understood that such entry would have

violated the Fourth Amendment rights of any resident or owner of the home.

Significantly, Plaintiffs fail to point to any contrary authority.

Accordingly, Buccilli is entitled to qualified immunity on Plaintiffs' Fourth

Amendment claim.


## CONCLUSION

Based on the following, Defendant's Motion (Dkt. 32), should be GRANTED;

Plaintiff's Motion (Dkt. 35), should be DENIED.  The Clerk of the Court should be

directed to close the file.


Respectfully submitted,

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      July 18, 2016
Buffalo, New York

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**<u>Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.</u>**

*Thomas v. Arn,* 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiffs and the Defendant.

SO ORDERED.

/s/ *Leslie G. Foschio*
_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      July 18, 2016
            Buffalo, New York