UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

TIMOTHY BATT,
LUANN BATT, and
JOSEPH BATT,                                                                Case # 12-CV-1198-FPG

                                        Plaintiffs,

                                                                                                DECISION AND ORDER

v.


LT. JOSEPH BUCCILLI,
                                        Defendant.
_____

## INTRODUCTION

On April 17, 2012, Lieutenant Joseph Buccilli ("Lt. Buccilli") of the Orchard Park Police Department entered the home of Timothy, LuAnn, and Joseph Batt ("the Batts") without a warrant or the Batts' consent to check on the welfare of LuAnn Batt's father, Fred Puntoriero. The parties differ sharply on the two key issues in this case: whether Lt. Buccilli's entry into the Batt's home violated the Fourth Amendment, and whether Lt. Buccilli is entitled to qualified immunity.

For the following reasons, the Court declines to resolve the first question, because even if a violation of the Fourth Amendment occurred, Lt. Buccilli is indeed shielded by qualified immunity, and this case must be dismissed.

## BACKGROUND[1]

On April 17, 2012, Lt. Buccilli was employed by the Town of Orchard Park Police Department, and at all times relevant to this action, was working in his capacity as a police officer.

---

[1] Courts must view the facts and their reasonable inferences in the light most favorable to the party opposing summary judgment. "In qualified immunity cases, this usually means adopting…the plaintiff's version of the facts." *Scott v. Harris*, 550 U.S. 372, 378 (2007). As such, the facts are drawn from the Batts' Statement of Material Facts (ECF No. 35-2), and are viewed in the light most favorable to them.

Fred Puntoriero is the father of LuAnn Batt. Prior to April 17, 2012, Fred Puntoriero had dementia, was wheelchair bound, and had previously been diagnosed in 2009 with failure to thrive. On April 17, 2012, Timothy Batt, LuAnn Batt, Joseph Batt, and Fred Puntoriero all resided at 3122 Bieler Road, Orchard Park, New York.

On April 17, 2012, Donna Locicero, a Senior Case Worker employed by the Erie County Department of Social Services, Adult Protective Services, received a call of concern from Annette Puntoriero, the daughter-in-law of Fred Puntoriero, regarding Fred Puntoriero. Adult Protective Services had not received any prior calls of concern regarding Fred Puntoriero.

During this call, Annette Puntoriero told Adult Protective Services[2] that Fred Puntoriero was living in the home of Timothy and LuAnn Batt; that Joseph Puntoriero and LuAnn Batt shared a "joint POA [Power of Attorney]" for Fred Puntoriero; and that LuAnn Batt "is making all the decisions" regarding Fred Puntoriero's care because Joseph Puntoriero is "out of town so often"

Annette Puntoriero also told Adult Protective Services that, at some point prior to April 17, 2012, her "husband had told her that [Fred Puntoriero] was very lethargic and could not stay focused on the conversation. And then Joseph [Puntoriero] thought that [Fred Puntoriero] could be dehydrated again, because [Fred Puntoriero] often doesn't drink enough water."

Annette Puntoriero further told Adult Protective Services that no one had seen Fred Puntoriero for two weeks; that Joseph Puntoriero told her that he went to the Batts' home on April 16, 2012; that Joseph Puntoriero told her that he was not permitted to see Fred Puntoriero on April 16; and that Joseph Puntoriero told her that he suspected Fred Puntoriero was not doing well and that was why he was not permitted to see Fred Puntoriero on that day.

---

[2]   The Batts do not dispute that these statements were made to Adult Protective Services by Annette Puntoriero on April 17, 2012, however, they do dispute the underlying truth of some of her statements.

Annette Puntoriero stated that she and LuAnn Batt did not see eye to eye on what was in the best interests of Fred Puntoriero; that Joseph Puntoriero and LuAnn Batt "did not agree on there being an issue with [Fred Puntoriero] at this time; and that there was "some animosity" between her and LuAnn Batt.

Annette Puntoriero further told Adult Protective Services that she "couldn't possibly know what was going on in LuAnn and Timothy's home; that she "didn't know what was going on in the other home;" that she "couldn't answer . . . questions" about whether Fred Puntoriero was eating or feeding; that there was a family dispute between Annette Puntoriero, Joseph Puntoriero, and LuAnn Batt; that she had not personally been to the Batts' home on April 16, 2012; that she had not personally been denied access to the Batts' home on April 16, 2012; and that she did not know what the condition and interior of the home was like. Adult Protective Services attempted to get as much information as possible from the Annette Puntoriero, but they did not ask her if Fred Puntoriero was under the care of Hospice or an outside caregiver.

After receiving this report from Annette Puntoriero, that same day, April 17, 2012, Donna Locicero, in consultation with her supervisor, Francine Amato, called 911 to request that the Orchard Park Police Department go to the Batts' home to conduct a welfare check on Fred Puntoriero.

Donna Locicero informed the Orchard Park Police Department that Adult Protective Services had received "a call today with some concern about [Fred Puntoriero] who lives with his daughter and son-in-law in Orchard Park;" that the reporter expressed "a concern over [Fred Puntoriero's] well-being;" that "the concern is that another family member was not allowed to get into the house when he went to visit yesterday, and they're not sure if [Fred Puntoriero] is ok;" that the last time Joseph Puntoriero had seen Fred Puntoriero was "the second or third of

3

April;" and that LuAnn Batt had denied Joseph Puntoriero entry to the Batts' home on April 16, 2012. Based on this 911 call, the Orchard Park Police Department dispatched Lt. Buccilli to assist Officer Kadi, who was on his way to the Batts' home to conduct the requested welfare check on Fred Puntoriero.

On the afternoon of April 17, 2012, Joseph Batt was in the Batts' home. At about 4:30 p.m. Joseph looked out the front window of the Batts' home and saw Lt. Buccilli and Officer Kadi standing outside their parked cars, talking in the Batts' driveway. While standing in the Batts' driveway, Officer Kadi was advising Lt. Buccilli of what the dispatcher had relayed to Officer Kadi with regard to Annette Puntoriero's complaint to Adult Protective Services.

Lt. Buccilli was aware that somebody had contacted Adult Protective Services about a potential welfare issue with Fred Puntoriero, and was aware that Adult Protective Services had requested that the Orchard Park Police Department conduct a welfare check on Fred Puntoriero.

Joseph Batt walked outside the Batts' home through a side door and approached Lt. Buccilli and Officer Kadi in the Batts' driveway. Joseph Batt did not have anything in his hands. Lt. Buccilli asked for Joseph Batt's name, and Joseph said his name was "Joe" and that he lived in the home. Lt. Buccilli asked Joseph Batt if he had a license or any identification, and Joseph Batt replied that he did not have it on him.

The officers then told Joseph Batt that they were there to conduct a welfare check at the request of Adult Protective Services. Joseph Batt told Lt. Buccilli that Fred Puntoriero was in the Batts' home, and also told Lt. Buccilli that he did not have permission to enter the Batts' home. Lt. Buccilli stated that he did not need permission from anyone to enter the Batts' home, and stated that he did not need to seek or obtain an access order from a court to enter the residence.

After speaking with Lt. Buccilli and Officer Kadi in the Batts' driveway, Joseph Batt re-entered the Batts' home through the side door. Lt. Buccilli and Officer Kadi followed Joseph Batt into the Batts' home through the side door. Joseph Batt attempted to close the side door through which he had entered the Batts' home, but Lt. Buccilli was already partially inside the doorway to the Batts' home. Lt. Buccilli put his foot in doorway to block the side door through which Joseph Batt had entered the Batts' home, and both Lt. Buccilli and Officer Kadi entered the Batts' home through the side door. Once inside, Joseph Batt again told Lt. Buccilli and Officer Kadi that they did not have permission to enter the Batts' home. Officer Kadi removed himself from the Batts' home.

While Lt. Buccilli and Officer Kadi were inside the Batts' home, Joseph Batt began recording the encounter using his phone's camera. During that encounter, Lt. Buccilli said "I'll tell you why we're here. Somebody contacted -- and keep [the video] rolling, please. Somebody contacted Adult Protective Services -- Erie County Adult Protective Services. And they contacted us, a social worker, requesting that we do a welfare check on you [Fred]. I don't know the basis or the allegations of what the welfare concerns are. But as I have been trying to explain to your grandson, Joe, and the other two individuals out there, that we do have a right to come in here when an allegation is made. And notice how I used the word 'allegation' that somebody's welfare may be in jeopardy. I don't need a search warrant. I don't need to ask permission to Joe and anybody else."

Lt. Buccilli also said "I don't know [the identity of the caller to Adult Protective Services]. I don't know, because that information is confidential. Now, if you want to contact, or you want to contact, or your grandson Dan wanted to contact Adult Protective Services and file a Freedom of Information for the allegation of the report, then more power to you. But I can't give

you information that I don't have. All I know is a county agency called. And based on their request, I have a right to enter the house and forcibly [sic], if need be, when somebody's welfare is possibly in question. And that's why I'm here. The allegation was made that they wanted a welfare check done on you."

Lt. Buccilli told Joseph Batt that he would be arrested if he obstructed Lt. Buccilli from observing Fred Puntoriero. Joseph Batt did not lay hands on Lt. Buccilli or initiate any physical contact with Lt. Buccilli, nor did Lt. Buccilli lay hands on Joseph Batt.

Lt. Buccilli ultimately observed Fred Puntoriero, who was sitting in the Batts' living room. He appeared well-dressed, well-groomed, and had a bowl of soup or something similar sitting beside him. Lt. Buccilli spoke with Fred Puntoriero in the Batts' living room for a few minutes, and asked Fred Puntoriero to provide and spell his last name.

After speaking with Fred Puntoriero, Lt. Buccilli left the Batts' home through the side door by which he had entered. As he was leaving, Lt. Buccilli told Fred Puntoriero and Joseph Batt, "All right. That's it. For now. We may be back. If they [Adult Protective Services] call again, we gotta come back."

After leaving the Batts' home, Lt. Buccilli informed dispatch that Fred Puntoriero appeared to be in a good environment, and that there was no need for further action on behalf of the Orchard Park Police Department other than referring the matter back to Adult Protective Services. Lt. Buccilli asked the dispatcher to contact Adult Protective Services and request that they send a case worker to the Batts' home. Lt. Buccilli and Officer Kadi remained at the Batts' home until they were ultimately joined by Timothy Batt, LuAnn Batt, Orchard Park Chief of Police Anthony Benz, and Senior Case Manager Nancy Sullivan of Erie County Department of Social Services, Adult Protective Services.

Ms. Sullivan does not remember what information she was provided prior to arriving at the Batts' home. She did not seek or obtain a warrant to enter the Batts' home, and did not believe that she needed to seek or obtain a warrant to enter the Batts' home on April 17, 2012. She stated that whenever she receives a report regardless of suspected abuse or neglect, regardless of what she knew or did not know, she would want to see the subject of a report within 24 hours, because Adult Protective Services received a phone call.

LuAnn Batt permitted Ms. Sullivan to enter the Batts' home and speak with Fred Puntoriero. LuAnn Batt told Ms. Sullivan that Fred Puntoriero was under the care of a doctor, that Fred Puntoriero was in Hospice care and was regularly visited by a Hospice nurse and a Hospice social worker, that LuAnn Batt was an R.N., that Fred Puntoriero had been seen by a nurse's aide earlier that day, that Fred Puntoriero was never left home alone, and that another adult was always present to care for Fred Puntoriero. She also provided Ms. Sullivan with contact information for Fred Puntoriero's Hospice nurse.

Ms. Sullivan interviewed Fred Puntoriero's Hospice nurse on April 19 and 20, 2012, who stated that that Fred Puntoriero was under Hospice care, that Fred Puntoriero was "well cared for," that "the family was taking wonderful care of [Fred Puntoriero]," and that the Hospice nurse had "no concerns" about the care Fred Puntoriero was receiving in the Batts' home.

Ms. Sullivan concluded that there was no reason to continue further investigation in to Fred Puntoriero's care, and advised Annette Puntoriero that Adult Protective Services would be closing the case. On April 20, 2012, Adult Protective Services formally closed its investigation into Annette Puntoriero's report.

## PROCEDURAL HISTORY

The Batts filed this civil rights lawsuit under 42 U.S.C. § 1983. They allege that on April 17, 2012, Lt. Buccilli, while acting under color of state law, deprived the Batts of their rights under the Fourth Amendment by entering their home. The case was originally assigned to United States District Judge Richard J. Arcara, who referred the case to United States Magistrate Judge Leslie G. Foschio pursuant to 28 U.S.C. §§ 636 (b)(1)(A) and (B). ECF No. 7.

After discovery, the parties filed competing summary judgment motions. Lt. Buccilli's motion argues that (1) no Fourth Amendment violation occurred, and (2) even if a violation occurred, he is entitled to qualified immunity. ECF No. 32. On the other hand, the Batts motion argues that Lt. Buccilli's warrantless entry into their home violated the Fourth Amendment, and because their Fourth Amendment rights were clearly established, qualified immunity does not protect Lt. Buccilli from liability. ECF No. 35. After briefing was completed, this case was transferred to United States District Judge Lawrence J. Vilardo (ECF No. 43), and was subsequently reassigned to this Court (ECF No. 44).

On July 18, 2016, Magistrate Judge Foschio issued his Report and Recommendation, which concludes that Lt. Buccilli did not violate the Fourth Amendment when he entered the Batt's home, and in any event, that Lt. Buccilli would be protected by the doctrine of qualified immunity. ECF No. 45. The Batts have filed objections (ECF No. 48) and argue that both of Magistrate Judge Foschio's conclusions are erroneous; Lt. Buccilli has filed a memorandum (ECF No. 49) in support of Magistrate Judge Foschio's determinations.

DISCUSSION

The Court must conduct a *de novo* review of the portions of Magistrate Judge Foschio's Report and Recommendation to which objections have been made. *See* 28 U.S.C. § 636(b)(1)(C). In doing so, the Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." *Id.*

There are two key issues presented in this case. First, did Lt. Buccilli's entry into the Batts' home violate the Fourth Amendment? Second, is Lt. Buccilli shielded from liability under the doctrine of qualified immunity?

I.   <u>Was the Fourth Amendment Violated</u>?

For many years, the Supreme Court mandated a two-step sequence to determine whether a government official was entitled to qualified immunity. First, courts had to determine if the Plaintiff's facts established that a constitutional right was indeed violated. Only if a plaintiff satisfied the first step would the court then decide whether the right at issue was clearly established at the time of a defendant's alleged misconduct. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001).

In 2009, the Supreme Court determined that the two-step *Saucier* analysis under was no longer mandated. Instead, the "judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Magistrate Judge Foschio concluded that Lt. Buccilli's entry into the Batts' home did not violate the Fourth Amendment, and the Batts strenuously object to that conclusion. In the Court's view, the question of whether a Fourth Amendment violation occurred is a close call. But ultimately, the Court does not need to answer the Constitutional question under the specific

facts and circumstances of this case, so the Court declines to adopt Magistrate Judge Foschio's conclusion that no Fourth Amendment violation occurred. Instead, the Court finds that the second prong of the qualified immunity analysis – whether the right was clearly established at the time of Lt. Buccilli's alleged misconduct – is dispositive in this case, and under *Pearson*, the Court elects to answer that question without addressing the Constitutional question first.

II. <u>Is Lt. Buccilli Entitled to Qualified Immunity?</u>

Public officials are immune from suit under 42 U.S.C. § 1983 unless they have "violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Plumhoff v. Rickard,* --- U.S. ----, 134 S. Ct. 2012, 2023 (2014) (internal quotation marks omitted). An officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in [his] shoes would have understood that he was violating it," *id.,* meaning that "existing precedent ... placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd,* 563 U.S. 731, 741 (2011).

In other words, official conduct violates clearly established law "when, at the time of the challenged conduct, 'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Id.* (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)). To this end, a plaintiff need not show a case "directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* This exacting standard "gives government officials breathing room to make reasonable but mistaken judgments" by "protect[ing] all but the plainly incompetent or those who knowingly violate the law." *al–Kidd,* 563 U.S. at 743.

Under the Second Circuit's test, courts determine whether the relevant law was "clearly established" by considering the specificity with which a right is defined, the existence of Supreme Court or Court of Appeals case law on the subject, and the understanding of a

reasonable officer in light of preexisting law. *See Scott v. Fischer,* 616 F.3d 100, 105 (2d Cir. 2010). An exactly on-point case is not necessarily required, and the Second Circuit "may nonetheless treat the law as clearly established if decisions from this or other circuits clearly foreshadow a particular ruling on the issue." *Terebesi v. Torreso*, 764 F.3d 217, 230–31 (2d Cir. 2014) (alterations, and internal quotations and citations omitted).

Magistrate Judge Foschio determined that Lt. Buccilli did not violate "clearly established" rights of the Batts when he entered their home to check on the welfare of Fred Puntoriero, a determination to which the Batts vehemently object. Specifically, Magistrate Judge Foschio held that there is no "precedent clearly establishing a right to traditional Fourth Amendment protections during the type of police entry at issue here." ECF No. 45 at 21.

To resolve this dispute, the key question is this: how should the Court define the right that is (or is not) "clearly established" in this case?

The Supreme Court has "repeatedly told courts ... not to define clearly established law at a high level of generality. The dispositive question is whether the violative nature of *particular* conduct is clearly established. This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition. Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine…will apply to the factual situation the officer confronts." *Mullenix v. Luna*, --- U.S. ----, 136 S. Ct. 305, 308 (2015).

This point is illustrated by the Supreme Court's decision in *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). There, the Ninth Circuit had denied qualified immunity to a police officer who shot a suspect that was fleeing in a car. In doing so, the Ninth Circuit held that the officer violated a clearly established rule, set forth in *Tennessee v. Garner*, 471 U.S. 1 (1985), that

"deadly force is only permissible where the officer has probable cause to believe that the suspect poses a threat of serious physical hard, either to the officer or to others." *Haugen v. Brosseau*, 339 F.3d 857, 873 (9th Cir. 2003).

The Supreme Court summarily reversed and held that the Ninth Circuit's use of *Garner's* "general" test for excessive force was "mistaken." *Brosseau*, 543 U.S. at 199. Instead, the Supreme Court explained that the correct inquiry was whether it was clearly established that the Fourth Amendment prohibited the officer's conduct in the "situation [the officer] confronted: whether to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight." *Id.* at 199-200. The Supreme Court went on to find that the officer was entitled to qualified immunity, as none of the cases discussed by the parties "squarely governs the case here." *Id.* at 201.

A similar scenario played out in *Anderson*. There, qualified immunity was denied in the courts below, who found a clearly established "right to be free from warrantless searches of one's home unless the searching officers have probable cause and there are exigent circumstances." *Anderson*, 483 U.S. at 640. The Supreme Court faulted this broad and general characterization of the question presented, and criticized the lower court's holding for failing to address the actual question at issue: whether "the circumstances with which Anderson was confronted .. constitute[d] probable cause and exigent circumstances." *Id.* at 640-41.

*Mullenix* further demonstrates the level of specificity required in defining the contours of whether the right at issue is clearly established. There, Chadrin Mullenix, a Trooper with the Texas Department of Public Safety ended a high speed chase of a fugitive, Israel Leija, by firing six shots from his police rifle into Leija's vehicle as it drove on the highway below where Mullenix was stationed. Four of the shots hit Leija and killed him. The district court and the

Fifth Circuit denied Mullenix qualified immunity, finding that he had violated the clearly established rule that a police officer may not "use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others." *Luna v. Mullenix*, 773 F.3d 712, 725 (5th Cir. 2014). The Supreme Court rejected this formulation, finding that "the general principle that deadly force requires a sufficient threat hardly settles this matter." *Mullenix*, 136 S. Ct. at 309. Rather, the Supreme Court framed the question of whether the right was clearly established as this:

> In this case, Mullenix confronted a reportedly intoxicated fugitive, set on avoiding capture through high-speed vehicular flight, who twice during his flight had threatened to shoot police officers, and who was moments away from encountering an officer at Cemetery Road. The relevant inquiry is whether existing precedent placed the conclusion that Mullenix acted unreasonably *in these circumstances* 'beyond debate.'

*Id.* (emphasis added.)

Only two months ago, the Supreme Court found it "again necessary to reiterate the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.' As this Court explained decades ago, the clearly established law must be 'particularized' to the facts of the case. Otherwise, '[p]laintiffs would be able to convert the rule of qualified immunity ... into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.'" *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (internal citations omitted). In vacating the lower courts' denial of qualified immunity, the Supreme Court found that the Tenth Circuit "misunderstood the 'clearly established' analysis: It failed to identify a case where an officer acting under similar circumstances as Officer White was held to have violated the Fourth Amendment." *Id.*

In this case, the Batts primary argument is that "[N]o less than nine opinions of the Supreme Court, Second Circuit, and the Western District of New York put Lt. Buccilli on

13

*specific notice* that even warrantless 'welfare checks' in the home are subject to traditional Fourth Amendment analysis." ECF No. 48 at 18 (emphasis in original).  For support, they posit that "'Welfare checks' have been subject to this general rule since the Supreme Court's 2006 'emergency aid' decision, *Brigham City [v. Stuart]*, 547 U.S. [398], 403 [2006], and the Second Circuit's unanimous decision in November 2011 which held that a warrantless 'welfare check' fails the 'emergency aid' test unless '[t]he objective circumstances at the time of [the officers]' entry could cause a reasonable officer to believe that there were exigent circumstances requiring prompt entry. *Montanez [v. Sharoh]*, 444 F. App'x [484], 486-87 [(2d Cir. 2011) (unpublished)]." ECF No. 48 at 18-19.  This argument overstates the holding of these cases, overstates their importance to the present analysis, and fails to take into account the Supreme Court's directions regarding the required level of specificity when defining the "clearly established" right at issue.

To begin, there is no doubt that *Brigham City* discusses a great deal of general Fourth Amendment principles and it certainly talks about the emergency aid doctrine.  But those general doctrines are far too broad for purposes of examining the "clearly established" right, and critically, the Supreme Court never discusses or even mentions the concept of welfare checks or any similar term within the *Brigham City* decision.

Next, the Second Circuit's decision in *Montanez* is greatly overstated by the Batts.  First, *Montanez* is an unpublished Summary Order, which does not have precedential effect in the Second Circuit.  Second, the panel in *Montanez* held that "Appellants did not violate Montanez's Fourth Amendment rights," so this decision cannot be used as an example of where an officer actually violated the Fourth Amendment violation.  Indeed, the Second Circuit found that determining the second part of the qualified immunity inquiry – namely, whether the right was

"clearly established" – was unnecessary in light of their determination that no Fourth Amendment violation occurred. *See id.* at 487.

Third, *Montanez* is easily distinguishable. While the decision does use the term "welfare check," the facts of that case are very different from the present matter. In *Montanez*, the officers went to the house at issue having been "informed that Montanez was armed and dangerous and a convicted felon wanted for weapons and narcotics violations…[and] were also warned to use 'extreme caution' if they located Montanez." *Id.* Further, the police had seized an Uzi 9mm firearm and drugs from the home at issue less than 24 hours earlier, and also seized an empty holster and boxes of .22 and .38 caliber ammunition – but not a weapon that corresponded to the holster or those calibers of ammunition. *Id.* Officers also "knew that there was a documented history of [children's services] involvement with Montanez's seven-year-old stepdaughter, which included substantiated complaints," and based upon all of this information, children's services "wanted to remove the child due to concerns about her health, welfare, and safety." *Id.* As such, even though the decision references welfare checks, it does so under circumstances so distinct from the present matter that it could not "clearly establish" a right in a situation that would be analogous to the situation faced by Lt. Buccilli – and again, the decision was a summary order, which does not establish precedent in the Second Circuit.

The Batts' further argument that "Lt. Buccilli acted in the shadow of two local opinions…*United States v. Paige*, 493 F.Supp.2d 641 (W.D.N.Y. 2007) and *United States v. Sikut*, 488 F.Supp.2d 291 (W.D.N.Y. 2007)" fares no better. Simply stated, it is doubtful that two district court opinions could create a "clearly established" principle for the purposes of the qualified immunity analysis under the Second Circuit's test. *See Scott*, 616 F.3d at 105 ("To determine whether a right is clearly established, we look to (1) whether the right was defined

with reasonable specificity; (2) whether Supreme Court or court of appeals case law supports the existence of the right in question, and (3) whether under preexisting law a reasonable defendant would have understood that his or her acts were unlawful.")  In any event, two district court cases certainly fall short of being a "robust consensus of cases of persuasive authority." *Wilson v. Layne,* 526 U.S. 603, 617 (1999).

In the end, no one has pointed this Court to any controlling case that clearly establishes the answer to this question:  when performing a welfare check on an individual in response to a request from adult protective services (or a similar agency), may a police officer enter a location to determine the welfare of that individual?

But even if the answer to that question was "clearly established" or "beyond debate," those answers could still be too general to put Lt. Buccilli on notice under the specific facts and circumstances of this case – which also include a 911 call, information relayed to adult protective services from a family member of the individual allegedly at risk, and Joseph Batt's actions of refusing to let Lt. Buccilli see the individual who was allegedly in distress.

For all of these reasons, the answer to the constitutional rule under the specific facts and circumstances of this case was not clearly defined with the requisite specificity, nor was the issue "beyond debate." *al–Kidd, 563 U.S. at 741*.  Indeed, "the constitutional question in this case falls far short of that threshold." *Id.*  As a result, even if Lt. Buccilli's entry into the Batt's residence violated the Fourth Amendment – a question the Court declines to resolve – he is entitled to qualified immunity, because the right was not "clearly established," and even if Lt. Buccilli's belief that his actions were justified was incorrect, he was not "plainly incompetent." *Malley v. Briggs,* 475 U.S. 335, 341 (1986).

## CONCLUSION

Magistrate Judge Foschio's Report and Recommendation (ECF No. 45) is ADOPTED IN PART.  The Court declines to adopt Judge Foschio's conclusion that no Fourth Amendment violation occurred, and the Court accepts and adopts Judge Foschio's conclusion that Lt. Buccilli is entitled to qualified immunity for the reasons stated in this decision.  The Batts' summary judgment motion (ECF No. 35) is DENIED, Lt. Buccilli's summary judgment motion (ECF No. 32) is GRANTED, and this case is DISMISSED WITH PREJUDICE.  The Clerk of Court is directed to enter judgment and to close this case.

IT IS SO ORDERED.

DATED:   March 31, 2017
         Rochester, New York

_____
HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court